| | |
|---|---|
| **SUZETTE K. BORNKAMP,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )     **CAUSE NO. 1:14-cv-00401-SLC** |
| | ) |
| **COMMISSIONER OF SOCIAL** | ) |
| **SECURITY,** *sued as Carolyn W. Colvin,* | ) |
| *Commissioner of Social Security*, | ) |
| | ) |
| **Defendant.** | ) |

## OPINION AND ORDER

Plaintiff Suzette K. Bornkamp appeals to the Court from a final decision of the

Commissioner of Social Security denying her application under the Social Security Act (the

"Act") for a period of disability and Disability Insurance Benefits ("DIB").[1]  (DE 1).  For the

following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Bornkamp has filed four separate applications for DIB, all alleging disability in the

period of April to June 2009.  (DE 9 Administrative Record ("AR") 193-215).  She filed her

most recent application on July 19, 2013.  (AR 209).  The Commissioner denied Bornkamp's

application initially and upon reconsideration, and Bornkamp requested an administrative

hearing.  (AR 90-116).  On April 22, 2014, a hearing was conducted by Administrative Law

Judge William D. Pierson ("the ALJ"), at which Bornkamp, who was represented by counsel,

and a vocational expert, Marie Kieffer ("the VE"), testified.  (AR 46-85).

---

[1] All parties have consented to the Magistrate Judge.  (DE 16); *see* 28 U.S.C. § 636(c).

On May 27, 2014, the ALJ rendered an unfavorable decision to Bornkamp, concluding that she was not disabled because despite the limitations caused by her impairments, she could perform a significant number of light work jobs in the economy. (AR 18-35). The Appeals Council denied Bornkamp's request for review (AR 1-14), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

On December 23, 2014, Bornkamp filed a complaint with this Court, seeking relief from the Commissioner's final decision. (DE 1). Bornkamp advances four arguments in this appeal, asserting that the ALJ: (1) relied on flawed testimony by the VE concerning the number of jobs; (2) failed to properly consider her scoliosis when evaluating whether she met or equaled a musculoskeletal listing at step 3; (3) improperly discounted the credibility of her symptom testimony; and (4) improperly denied controlling weight to the opinion of her treating physicians.[2] (DE 14 at 6-16).

## II. FACTUAL BACKGROUND[3]

### A. Background

At the time of the ALJ's decision, Bornkamp was 53 years old (AR 35, 233); had a high

---

[2] Bornkamp also contends that the ALJ made two procedural errors, the effect of which she claims is "questionable due process." (DE 14 at 5-6). She asserts that the Social Security Administration did not "process" her application for Supplemental Security Income ("SSI") and that the ALJ failed to discuss "the import of [her] prior applications." (DE 14 at 5). As to the first purported error, Bornkamp has not produced any evidence showing that she actually applied for SSI. In any event, the five-step sequential evaluation is the same for DIB and SSI, *see* 20 C.F.R §§ 404.1520, 416.920, and thus, Bornkamp's SSI claim would ultimately have fared no better than her DIB claim does. As to the second purported procedural error, Bornkamp concedes that there is no material harm in the ALJ not discussing her prior applications "in light of the ALJ's *de facto* reopening of those applications." (DE 14 at 5). Notably, there is no evidence that Bornkamp raised either of these procedural issues during the administrative process. As such, Bornkamp's assertion of "questionable due process" does not merit further discussion or necessitate a remand of this case.

[3] In the interest of brevity, this Opinion recounts only the portions of the 1,124-page administrative record necessary to the decision.

school education (AR 324); and had past work experience as a finisher, auto assembler, and molding press operator for an auto parts manufacturer (April 1984 to April 2009), as a security guard (September 2010 to September 2011), and as a prep cook for McDonald's (December 2012 to April 2013). (AR 69-70, 236, 324, 384). In her application, Bornkamp alleged disability due to bipolar disorder, scoliosis, and degenerative disc disease, together with various other physical impairments. (AR 247, 323).

### B. Bornkamp's Testimony at the Hearing

At the hearing, Bornkamp testified that she is single and lives with her 83-year-old mother; she could no longer afford her own apartment, but she had health insurance. (AR 50-51, 68). She drives at least once a week for errands and had driven herself to the hearing. (AR 51). She has no difficulty performing her self care. (AR 64-65). In a typical day, she makes coffee, smokes, reads the paper, performs her self care, makes lunch, lies down and naps, makes dinner and dines with her mother, watches television, and does household chores such as washing dishes, vacuuming, and cleaning the bathrooms. (AR 62-64). She is able to bend over and reach for cleaning products kept under the sink. (AR 64). She performs yard work and uses a riding lawn mower to cut their three-and-a-half-acre lawn. (AR 66).

Bornkamp stated that her lower back feels numb, is warm, and has "pins and needles" and sometimes stabbing sensations. (AR 65). The pain radiates into her low back and left hip when she walks, causing her steps to get shorter until she has to sit down. (AR 65). She has pins and needles from her knees to her feet when she lies down at night. (AR 65). She also has degenerative arthritis in her neck, causing her discomfort when holding her head to the left for an extended period. (AR 67). She was not taking any pain medication for her back or neck pain at

the time, but an epidural injection in her neck had been helpful in the past.  (AR 67-68).  She

estimated that she could stand for 15 minutes before needing to lean against something, walk

one-third of a mile before needing to rest, and lift 10 pounds, but she could perform no pushing

or pulling.  (AR 60).  She thought she could stand for 30 minutes total and walk for 30 minutes

total in an eight-hour period.  (AR 74).  She stated that she quit her most recent job at

McDonald's because she could not tolerate the required standing and reaching.  (AR 72-73).

As to her mental health, Bornkamp stated that she suffers from depression and cries

frequently.  (AR 61).  Medication has helped to reduce her symptoms of sadness and anxiety, but

she still has several bad days a month when she sleeps more and wants to be alone.  (AR 61-62).

## C.  Summary of the Medical Evidence

Bornkamp has a history of hypertension and a myocardial infarction that occurred in

April 2007.[4]  (AR 469-517, 606-44).

On June 15, 2009, Michael Arata, M.D., an orthopedic surgeon, performed a surgical

spinal fusion and spinal decompression on Bornkamp due to progressive scoliosis and lumbar

radiculitis of her left leg.  (AR 668-87).  She had been experiencing back pain and left leg

discomfort that were aggravated by prolonged sitting, standing, and walking.  (AR 673).

On July 21, 2009, M. Brill, M.D., a state agency physician, reviewed Bornkamp's record

and concluded that within 12 months of surgery, she could return to light duties and lift 10

pounds frequently; stand or walk for six hours in an eight-hour workday; sit for six hours in an

eight-hour workday; and occasionally reach overhead with both arms, climb, balance, stoop, and

_____

[4] Records show blood pressure elevations in late 2011, periods of stability, and elevations resulting in a
prescription for Lisinopril in June 2013.  (AR 817-38, 924-1020).  A March 2014 echocardiogram revealed a normal
ejection fraction and mild hypertrophy.  (AR 1085-1109).

kneel.  (AR 700-07).  Dr. Brill's opinion was affirmed in January 2010, by J.V. Corcoran, M.D.,

a state agency physician who also reviewed Bornkamp's record.  (AR 760).

In September 2009, Arata reported that Bornkamp was "doing better" and that her

surgery had relieved a lot of her left hip pressure.  (AR 718).  She still had difficulty squatting,

some tingling in her right upper leg, and a pulling sensation with lifting; she was taking Vicodin

occasionally.  (AR 718).  Dr. Arata kept her off work.  (AR 719).

On December 11, 2009, Bornkamp reported some thoracolumbar pain and some low back

discomfort to Dr. Arata, which he attributed to the fact that she had been fused down to L5 and

only had one motion segment at L5-S1.  (AR 1022).  He suggested that she begin a physical

therapy program.  (AR 1022).  He further stated: "Obviously, Ms. Bornkamp has significant,

ongoing problems with her back and finding employment will be difficult, if not impossible in

her situation."  (AR 1022).  He assigned her the following permanent restrictions:  no lifting

floor to waist; no lifting with arms extended; no pushing, pulling, stooping, bending, squatting,

kneeling, crawling, or climbing; and only occasional lifting waist to shoulder, lifting shoulder to

overhead, and standing, walking, or balancing.  (AR 1029).

On December 31, 2009, Bornkamp visited John Wallace, M.D., her primary care

physician, concerning her disability application.  (AR 764).  He opined in a letter that he agreed

with the permanent restrictions assigned by Dr. Arata, adding that she could lift up to 15 pounds.

(AR 764).

On June 16, 2010, Bornkamp returned to Dr. Arata for a one-year followup, and he noted

that she was "getting along remarkably well."  (AR 1023).  She reported occasional low back

pain and some mid-thoracic pain, which he presumed was at the junctional levels of her fusion,

as well as some numbness and tingling down her back and legs.  (AR 1023, 1031).  She stated

that she could not walk long distances.  (AR 1031).  Dr. Arata assessed that "[h]er symptoms . . .

are not all that severe, and she is pleased and getting along well."  (1023).  She was instructed to

"watch lifting" but to perform activities as tolerated.  (AR 1031).  Her X-rays looked

satisfactory, and Dr. Arata planned to continue to treat her conservatively, instructing her to call

if any problems arose.  (AR 1023).  Bornkamp did not return to Dr. Arata until almost three

years later—when she was applying for disability.

In April 2011, H.M. Bacchus, Jr., M.D., examined Bornkamp in connection with her

disability application.  (AR 781-84).  She moved rather slowly onto and off of the exam table

and into and out of the chair.  (AR 782).  She had some tenderness to palpation and range of

motion of her thoracolumbar and cervical spine.  (AR 782).  Her gait was steady and sustainable,

although mildly antalgic and slightly favoring her left leg.  (AR 782).  She was able to walk on

heels and toes, tandem walk, and squat one-half of the way down, but she hopped gingerly on

her left.  (AR 782).  She had range of motion deficits in her neck, lower back, left upper

extremity, knees, and left lower extremity, but no atrophy or spasm.  (AR 782).  Her muscle

strength, tone, and grip strength were 4/5 in her left upper and lower extremities and 5/5 in her

right upper and lower extremities.  (AR 782).  Dr. Bacchus opined that Bornkamp retained the

physical functional capacity to perform light to moderate duties allowing for frequent position

changes.  (AR 783).

In May 2011, M. Ruiz, M.D., a state agency physician, reviewed Bornkamp's record and

concluded that she could lift 10 pounds frequently and 20 pounds occasionally; stand or walk six

hours in an eight-hour workday; sit six hours in an eight-hour workday; perform unlimited

pushing and pulling within the lifting restrictions; and balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, or scaffolds. (AR 791-98).

In September 2011, Bornkamp visited Dr. Wallace for evaluation of her depression, but she also reported that her low back pain had worsened. (AR 832). She stated that she had constant nerve pain that interfered with her sleep; she denied any increase in focal flares, limitations of motion, or stiffness. (AR 832). She was not taking any medications and had quit her job as a security guard three days earlier. (AR 832). Dr. Wallace assessed a depressive disorder and lumbago, and he prescribed Cymbalta. (AR 833).

In May 2012, B.T. Onamusi, M.D., examined Bornkamp, stating that she presented with complaints of back pain related to scoliosis. (AR 856-57). He noted that she had not followed up with any doctors specifically for her back. (AR 856). She reported constant, mild pain with occasional aggravation to a moderate degree with physical activities or prolonged walking, sitting, or standing; radiation of pain with numbness, tingling, and weakness in her right leg; some trouble with balance due to her right leg weakness; and stress incontinence. (AR 856). Upon examination, she walked with a normal gait, could squat while holding on to the table, could stand on heels and toes, and had no difficulty transferring onto or off of the examination table. (AR 857). Grip strength was 60 pounds on the right and 65 pounds on the left. (AR 857). She was able to reach forward, push and pull with her upper extremities, and use her hands for fine coordination and manipulative tasks. (AR 857). A straight leg raise test was negative bilaterally, and she had no tenderness of her back. (AR 858). He assessed chronic lower back pain, status post surgery with instrumentation, and opined that she was "capable of engaging in light physical demand activities as defined in the Dictionary of Occupational Titles." (AR 858).

X-rays in June 2012 showed significant lumbar levoscoliotic curvature, multilevel degenerative disc space, and facet joint changes. (AR 879).

Also in June 2012, A. Dobson, M.D., a state agency physician, reviewed Bornkamp's record and opined that she could lift 10 pounds frequently and 20 pounds occasionally; stand six hours in an eight-hour workday; sit six hours in an eight-hour workday; perform unlimited pushing and pulling within the lifting restrictions; balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, or scaffolds; and must avoid concentrated exposure to wetness and hazards, such as machinery and heights. (AR 881-88).

In April 2013, Bornkamp visited Dr. Wallace for complaints of back pain that had started a few days earlier but was a recurrent problem. (AR 929). She stated that she had bent over at home and again at work and had felt a pulling in her lower back. (AR 929). The pain had gradually worsened and was aggravated by sitting, bending, walking, or driving; she rated the pain as 5/10. (AR 929). She also complained of some tingling and numbness in her left leg. (AR 929). On physical exam, Bornkamp walked cautiously and stiffly, and she had tenderness to palpation over the right paraspinous area. (AR 929). She had decreased sensation in the lateral portion of her left lower leg; she was unable to walk on toes, and her heel walking was tender. (AR 929). A straight leg raise test was negative, and she demonstrated reduced range of motion in her back. (AR 929). Dr. Wallace prescribed medications. (AR 929).

In June 2013, Bornkamp returned to Dr. Wallace for a one-week history of pain in her left shoulder. (AR 941). She rated her pain as 4/10 and stated that it was gradually improving; her symptoms were aggravated by activity. (AR 941). Upon examination, her left shoulder was tender anteriorly to palpation and with range of motion. (AR 942). She reported no tenderness

with resisted elbow or forearm motions, and she could reach behind her head. (AR 942). Dr. Wallace recommended that she take ibuprofen. (AR 942).

On July 3, 2013, Bornkamp returned to Dr. Arata, conveying that she had applied for disability. (AR 1024). It had been three years since her last visit. (AR 1024). He noted that her back looked good clinically, but she was continuing to have a lot of diffuse lower back pain and stiffness. (AR 1024). Her pain was associated with prolonged standing, sitting, and walking. (AR 1024). Dr. Arata wrote that he believed she was "very genuinely affected by the scoliosis" and that he would support her in her application for disability if requested. (AR 1024).

On July 30, 2013, Bornkamp consulted with K. Rahn, M.D., an orthopedic surgeon, for complaints of neck pain. (AR 1025). She estimated that her worst pain was 2/10. (AR 1025). An MRI of her cervical spine showed multi-level stenosis, mild to moderate, and Dr. Rahn recommended that she receive an injection. (AR 1027-28, 1035). He stated that she had no restrictions. (AR 1032).

In August 2013, Bornkamp consulted with G.D. Bojrab, M.D., concerning an injection for neck pain that was radiating to her shoulders. (AR 890-910). She described her pain as 2/10, noting that it increased with activity. (AR 890). She denied any back pain in her thoracic or lumbar spine, but reported pain on palpation of her cervical spine. (AR 890-91). She demonstrated good range of motion of her neck and 5/5 muscle strength. (AR 891). A straight leg raise test was negative bilaterally. (AR 891). The following month, Bornkamp reported that the injection had been somewhat helpful. (AR 1028).

In October 2013, Dr. Onamusi examined Bornkamp for a second time. (AR 1059-62). She reported continued pain with limited motion in her spine. (AR 1059). Her gait was normal,

and she was able to transfer onto and off of the exam table without difficulty. (AR 1060). She could squat, kneel, walk in tandem, and stand on heels and toes. (AR 1060). Her grip strength was 70 pounds on the right and 65 pounds on the left; she was able to reach forward, push, and pull with her upper extremities. (AR 1060). She had restricted range of motion in her back and mild tenderness involving the lower lumbar and sacral area. (AR 1060). A straight leg raise test was negative bilaterally. (AR 1060). Dr. Onamusi opined that Bornkamp was "capable of engaging in sedentary to light physical demand level activities as defined in the Dictionary of Occupational Titles." (AR 1061).

Records show that Bornkamp also received mental health treatment at Parkview Behavioral Health and Northeastern Center throughout the relevant period. (AR 518-36, 725-36, 775-80, 839-51, 894-923, 1070-84, 1110-21). She was prescribed psychotropic medications and participated in therapy on both an inpatient and outpatient basis. (AR 518-36, 725-36, 775-80, 839-51, 894-923, 1070-84, 1110-21).

After the ALJ issued his decision on May 27, 2014, Bornkamp submitted to the Appeals Council a letter from Dr. Arata dated November 3, 2013, addressed "To Whom It May Concern." (AR 5, 1122-24). In the letter, Dr. Arata noted that Bornkamp had presented in March 2009 with severe scoliosis measuring 65 degrees and severe lumbar spinal stenosis at L3-4 and L4-5, that she had undergone extensive spinal fusion and decompressive surgery, that she had made a "satisfactory recovery" from the surgery, and that she had been seen "periodically" thereafter. (AR 1123). He had most recently seen Bornkamp on July 3, 2013. (AR 1123). He articulated that her spinal fusion appeared to be solid, but that she complained of some diffuse stiffness in her back and pain with prolonged standing, sitting, or walking. (AR 1123). He

believed that her back symptoms were "genuine and permanent." (AR 1123). He opined that Bornkamp was "unable to physically work" because of her severe scoliosis and extensive spinal fusion and that she "should genuinely qualify for permanent physical disability" because of her spinal condition. (AR 1123).

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record, but does not "reweigh the evidence, resolve conflicts, decide questions of credibility," or substitute its judgment for the Commissioner's. *Id.* (citations omitted). Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

# IV. ANALYSIS

## A. The Law

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months . . . ." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the

---

[5] Before performing steps four and five, the Commissioner must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R. §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

Commissioner.  *Clifford*, 227 F.3d at 868.

### B. The Commissioner's Final Decision

On May 27, 2014, the ALJ issued the decision that ultimately became the Commissioner's final decision.  (AR 18-35).  At step one, the Commissioner found that although Bornkamp had worked as a security guard and at McDonald's after her alleged onset date, her earnings were below the substantial gainful activity threshold.  (AR 20).  At step two, the Commissioner concluded that Bornkamp had severe impairments of:  levoscoliotic curvature with degenerative disc disease and facet joint changes, status post fusion and decompression in June 2009; multiple degenerative spondylosis of the cervical spine, with complaints beginning in 2013; obesity; bipolar disorder; and cannabis abuse.  (AR 21).

At step three, the Commissioner determined that Bornkamp's impairment or combination of impairments were not severe enough to meet or equal a listing.  (AR 22).  Before proceeding to step four, the Commissioner found that Bornkamp's subjective complaints were not entirely credible and assigned her the following RFC:

> [T]he claimant has the [RFC] to perform light work . . . as follows: sit six hours in an eight-hour workday, and stand and/or walk six hours in an eight-hour workday; lift, carry, push, and pull ten pounds frequently and 20 pounds occasionally; occasionally kneel, crouch, balance, and squat; no crawling; no ropes, ladders, or scaffolds; occasional stairs and ramps, one to two flights with rails; occasional bending and stooping, in addition to what is needed to sit; frequent, not constant, reaching with the upper extremities; no work within close proximity to hazardous machinery or open heights, wet surfaces, and uneven terrain (outside of stair use); limited to simple, routine, and repetitive tasks; no complex tasks; can remember simple work-like procedures, and can maintain the concentration required to perform simple tasks; limited to superficial interaction with coworkers, supervisors, and the public, with superficial interaction defined as occasional and casual contact not involving prolonged conversation, contact with supervisors still involves necessary instruction.

(AR 25).

At step four, the Commissioner concluded that Bornkamp was unable to perform any of her past relevant work as an auto assembler and molding press operator. (AR 33). At step five, the Commissioner found that there were a significant number of light exertional level jobs in the economy that Bornkamp could perform, including a small products assembler, electronics worker, and electrical accessories assembler. (AR 34). Therefore, Bornkamp's claim for DIB was denied. (AR 35).

### C. The ALJ's Step-Five Finding Is Supported by Substantial Evidence

To begin, Bornkamp argues that the ALJ's step-five finding is not supported by substantial evidence because he relied on inadequate testimony by the VE concerning the number of jobs that a hypothetical individual of Bornkamp's age, experience, and RFC could perform.[6] Bornkamp's first argument is ultimately unpersuasive.

As explained earlier, the Commissioner bears the burden at step five of "providing evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do, given [her] residual functional capacity and vocational factors." 20 C.F.R. § 404.1560(c)(1); *see also Bretton v. Astrue*, 521 F.3d 799, 803-04 (7th Cir. 2008). When the ALJ relies on testimony from a vocational expert at step five, that testimony must be reliable. *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002). Unreliable vocational expert testimony is insufficient to support the ALJ's decision at step five. *See Skinner v. Astrue*, 478 F.3d 836,

_____

[6] Bornkamp also cursorily asserts as part of her step-five argument that the RFC assigned by the ALJ does not adequately incorporate all of her limitations. (*See* DE 14 at 7 ("The weakness in the vocational evidence in this case is twofold. First, the ALJ's residual functional capacity (RFC) finding does not adequately incorporate all of Ms. Bornkamp's credible limitations, as will be discussed in greater detail in subsequent sections.")). The Court will address *infra* the challenges to the RFC that Bornkamp raises in connection with her other arguments. The Court otherwise deems this cursory step-five argument waived. *See, e.g.*, *Webster v. Astrue*, 580 F. Supp. 2d 785, 794 (W.D. Wis. 2008) (explaining in a social security appeal that undeveloped arguments are deemed waived (citing *Kochert v. Adagen Med. Int'l, Inc.*, 491 F.3d 674, 679 (7th Cir. 2007))).

841 (7th Cir. 2007).

Bornkamp argues that the VE's testimony concerning the number of jobs upon which the ALJ relied is inconsistent with the limitations posed in the hypothetical questions and in the RFC. In framing this argument, Bornkamp explains that she was limited in the RFC and the hypotheticals to simple, routine, and repetitive tasks, no complex tasks, simple work-like procedures, and superficial interaction with coworkers, supervisors, and the public. (AR 25). In response to a hypothetical question with these limitations, the VE testified that such an individual could perform the jobs of small products assembler, electronics worker, and electrical accessories assembler, and that all of these jobs were "SVP 2" jobs. (AR 34, 76-78).

Bornkamp explains that specific vocational preparation, or SVP, is "the amount of time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance of a job." (DE 14 at 8 (citing Program Operations Manual System ("POMS") § 25001.001 Medical-Vocational Quick Reference Guide; Dictionary of Occupational Titles ("DOT") (Rev. 1991))). "An SVP 1 designation means a job that requires a short demonstration only to perform the job. An SVP 2 designation means a job that requires anything beyond a short demonstration up to and including one month of instruction to prepare the person to perform the job." *Sigite v. Colvin*, No. 13-3140, 2015 WL 1887774, at *16 (C.D. Ill. Apr. 24, 2015) (citation omitted); *see also* POMS § DI 25001.001 Medical-Vocational Quick Reference Guide, https://secure.ssa.gov/apps10/poms.nsf/lnx/0425001001 (last visited Sept. 12, 2016).

The DOT describes multiple factors essential to the performance of work, one of which is general education development, or GED. The GED "embraces those aspects of education

(formal and informal) which are required of the worker for satisfactory job performance." (DE 14 at 8); *see* DOT App'x C (4th ed, Rev. 1991). Bornkamp explains that the jobs identified by the VE are all GED reasoning level 2 jobs, which require the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete variables in or from standardized situations." (DE 14 at 8-9 (citing DOT App'x C (4th ed, Rev. 1991))). To compare, GED reasoning level 1 jobs require the ability to "[a]pply commonsense understanding to carry out simple one- or two-step instructions" and "[d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job." (DE 14 at 9 (citing DOT App'x C (4th ed. Rev. 1991))).

Bornkamp argues that her RFC for simple, routine, and repetitive tasks, *no complex tasks*, and simple work-like procedures is more akin to GED reasoning level 1 jobs than GED reasoning level 2 jobs. In support, she cites two district court cases from Maine and California. (DE 14 at 9 (citing *Allen v. Barnhart*, No. C-02-3315 EDL, 2003 WL 22159050, at *10-11 (N.D. Cal. Aug. 28, 2003); *Hall-Grover v. Barnhart*, No. 03-239-P-C, 2004 WL 1529384, at *4 (D. Me. Apr. 30, 2004))). As Bornkamp sees it, the ALJ relied upon flawed VE testimony, and as such, the ALJ's step-five finding is not supported by substantial evidence.

The Court is not persuaded that the ALJ erred in relying on the VE's testimony concerning the number of jobs. As this Court recently observed in *Marshall v. Colvin*, district courts in this Circuit are divided on whether restrictions such as the one contained in Bornkamp's RFC are inconsistent with a job at GED reasoning level 2. 2014 WL 1230219, at *21 (N.D. Ind. Mar. 25, 2014) (comparing *Simms v. Astrue*, 599 F. Supp. 2d 988, 1007 (N.D.

16

Ind. 2009), with *Thompkins v. Astrue*, No. 09 c 1339, 2010 WL 5071193, at *11 (N.D. Ill. Dec.

6, 2010)).  "The Seventh Circuit [Court of Appeals] has not spoken on the exact issue of whether

Reasoning level 2 is inconsistent with this sort of RFC; however, the Seventh Circuit has

considered Reasoning Level 3—one step more demanding than Reasoning Level 2—and found it

could be consistent with 'simple' tasks."  *Id.* (citing *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir.

2009); *Sawyer v. Colvin*, 512 F. App'x 603, 610-11 (7th Cir. 2013)); *see Huttner v. Colvin*, No.

13 CV 6606, 2015 WL 9473425, at *5 (N.D. Ill. Dec. 28, 2015) (finding no conflict between the

cashier job's GED reasoning level 3 and the RFC for simple, routine, and repetitive tasks, and

consequently, that the ALJ was not obligated to question the vocational expert about the cashier

job's reasoning level).  As such, the Court declines to find that GED reasoning level 2 is

inconsistent with the RFC assigned to Bornkamp.

Furthermore, even if the limitations in Bornkamp's RFC could be construed as

inconsistent with GED reasoning level 2 such that a conflict did exist, Bornkamp's counsel did

not raise or inquire about the purported conflict when cross-examining the VE.  (*See* AR 82-85).

Rather, Bornkamp's counsel cross-examined the VE about the physical limitations and

absenteeism rates concerning the identified jobs, *not* the mental requirements necessary to

perform the jobs.  "[A]n ALJ may rely on imperfect VE testimony if a claimant does not

question the basis for the testimony at the time of the hearing."  *Overman v. Astrue*, 546 F.3d

456, 465 (7th Cir. 2008) (citing *Donahue*, 279 F.3d at 446; *Barrett v. Barnhart*, 355 F.3d 1065,

1067 (7th Cir. 2004)).

As such, Bornkamp's only avenue is to argue that the conflict was "obvious enough that

the ALJ should have picked up on [it] without any assistance, for SSR 00-4p requires only that

the ALJ investigate and resolve apparent conflicts between the VE's evidence and the DOT." *Id.* at 463 (citing SSR 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000); *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006)). But the Court finds that even if there was a purported conflict (which the Court is not saying there is), it surely was not of such a nature that it was apparent to the ALJ at the hearing. *See Diaz v. Colvin*, No. 2:12-CV-46-PRC, 2013 WL 5460151, at *13 (N.D. Ind. Sept. 30, 2013) (finding that a purported conflict between a job with GED reasoning level 2 and the claimant's limitation to one- to two-step tasks was not so obvious that the ALJ should have picked up on the conflict without the assistance of counsel); *Pomilia v. Astrue*, No. 2:11-CV-15-PRC, 2012 WL 691628, at *20 (N.D. Ind. Mar. 2, 2012) (same).

In any event, Bornkamp does not point to any evidence of record that suggests she is incapable of performing jobs at GED reasoning level 2. She has a high school education, drives a car, and independently manages her funds, and her mental status examinations generally did not reveal any major cognitive or intellectual deficits. (*See* AR 753, 788, 801, 840, 842, 844, 847, 863, 1056, 1076, 1080); *see, e.g.*, *Marshall*, 2014 WL 1230219, at *21 (noting that the claimant did not argue that she could not perform jobs at a GED reasoning level 2, that the evidence indicated that she had obtained her GED, and that the only limitations placed upon her was the RFC for simple, routine, repetitive tasks requiring simple judgment and brief and superficial interactions with coworkers).

In sum, the Court declines to find that an apparent conflict exists between the GED reasoning level of the jobs identified by the VE at the hearing and the RFC for simple, routine, and repetitive tasks, no complex tasks, simple work-like procedures, and superficial interaction with coworkers, supervisors, and the public. As such, the ALJ's step-five finding—which relies

on the VE's testimony concerning the number of jobs—is supported by substantial evidence.

<em>D. The ALJ's Step-Three Finding that Bornkamp Did Not Meet<br/>or Equal a Listing Is Supported by Substantial Evidence</em>

Next, Bornkamp argues that the ALJ erred when he found at step three that she did not

meet or equal a musculoskeletal listing. Specifically, Bornkamp argues that the ALJ erred by

failing to specifically mention her scoliosis as one of the conditions considered under Listing

1.04, Disorders of the Spine, and by failing to consider paragraph L of Listing 1.00, the

introductory paragraphs for the musculoskeletal listings. For the following reasons, Bornkamp's

challenge to the ALJ's step-three finding does not necessitate a remand.

The listings describe impairments that are considered presumptively disabling when

specific criteria are met. *See* 20 C.F.R. § 404.1525(a). To meet or equal a listed impairment, the

claimant must satisfy all of the criteria of the listed impairment. *Maggard v. Apfel*, 167 F.3d

376, 379-80 (7th Cir. 1999). The criteria of Listing 1.04 is as follows:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once very 2 hours;
>
> or

C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by
  findings on appropriate medically acceptable imaging, manifested by chronic
  nonradicular pain and weakness, and resulting in inability to ambulate effectively,
  as defined in 1.00B2b.

20 C.F.R. § 404, Subpart P, App'x 1, 1.04.  The claimant bears the burden of proving her

condition meets or equals a listed impairment.  *Maggard*, 167 F.3d at 379-80; *see also Sims v.

Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002); *Shinaberger v. Barnhart*, No. 1:05-cv-0276-DFH-

TAB, 2006 WL 3206338, at *11 (S.D. Ind. Mar. 31, 2006).  Yet, the Seventh Circuit has

clarified that while the burden of proof rests with the claimant, an ALJ "should mention the

specific listings he is considering and his failure to do so, if combined with a 'perfunctory

analysis,' may require a remand."  *Ribaudo v. Barnhart*, 458 F.3d 580, 583-84 (7th Cir. 2006)

(citing *Barnett*, 381 F.3d at 670; *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir.

2003)); *see also Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

When discussing Bornkamp's physical impairments at step three, the ALJ stated:

The claimant does not have an impairment that meets the criteria of Listing 1.04
(Disorders of the spine).  The evidence does not establish root compression,
limitation of motion, motor loss, and a positive straight-leg raising test.  Neither is
there evidence of spinal arachnoiditis or lumbar spinal stenosis resulting in
pseudoclaudication.

(AR 22).  Bornkamp argues that the ALJ's analysis is "perfunctory" and "boilerplate without

factual support" such that it must be remanded.  (DE 14 at 10).  She contends that the ALJ

should have specifically mentioned her scoliosis when discussing Listing 1.04, and furthermore,

that the record contains evidence of nerve root compression and motor loss and pain as required

by Listing 1.04.

To begin, it is unclear why Bornkamp believes that the ALJ was required to specifically

mention her scoliosis when discussing Listing 1.04, as it is not among the criteria specified in the

Listing.  *See generally Skinner*, 478 F.3d at 845 ("[T[he existence of these diagnoses and symptoms does not mean the ALJ was required to find that [the claimant] suffered disabling impairments.").  Instead, the ALJ succinctly identified the medical findings required for Listing 1.04 that were absent in the record.  Then later in his decision, the ALJ elaborated on Bornkamp's spinal impairment, noting that she had negative straight-leg raising tests, mostly intact sensation, mostly normal range of motion and strength, and little difficulty walking.  (AR 26-30); *see Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-69 (7th Cir. 2010) ("[T]idy packaging" is not required in ALJs' decisions because the courts read them "as a whole and with common sense." (collecting cases)).  In fact, Bornkamp fails to cite to any evidence of pseudoclaudication, an inability to ambulate effectively, spinal arachnoiditis, reflex loss, or positive straight-leg raising in sitting and supine.  To reiterate, a claimant must satisfy *all* of the criteria of the listed impairment.  *Maggard*, 167 F.3d at 379-80.

Bornkamp does cite to some evidence of nerve root compression that the ALJ did not address at step three.  (DE 14 (citing AR 593, 599-600, 674, 763)).  But that evidence pre-dated her June 2009 spinal fusion and decompressive surgery and her alleged onset date, and thus, it is of little relevance.  *See Thompson v. Colvin*, 575 F. App'x 668, 676 (7th Cir. 2014) (affirming the ALJ's decision that afforded less weight to medical evidence pre-dating the claimant's alleged onset date).  Notably, Bornkamp cites to no evidence of nerve root compression *after* her spinal fusion and decompression.  Furthermore, the evidence she cites to in an attempt to show "motor loss and pain" after her surgery reveals primarily minor limitations.  (DE 14 at 11 (citing AR 782 (showing muscle strength and tone of 4/5 on the left and 5/5 on the right), 891 (revealing 5/5 muscle strength and pain in the cervical spine, but not in the thoracic or lumbar

spine))).  In short, on this record Bornkamp has failed to bear her burden of proving that she met

or equaled Listing 1.04.

Bornkamp also argues that the ALJ erred because he did not explicitly consider

paragraph L of Listing 1.00, the introductory paragraphs for the musculoskeletal listings.

Paragraph L states:

> L.  Abnormal curvatures of the spine.  Abnormal curvatures of the spine
> (specifically, scoliosis, kyphosis and kyphoscoliosis) can result in impaired
> ambulation, but may also adversely affect functioning in body systems other than
> the musculoskeletal system.  For example, an individual's ability to breathe may
> be affected; there may be cardiac difficulties (e.g., impaired myocardial function);
> or there may be disfigurement resulting in withdrawal or social isolation.  When
> there is impaired ambulation, evaluation of equivalence may be made by
> reference to 14.09A.  When the abnormal curvature of the spine results in
> symptoms related to fixation of the dorsolumbar or cervical spine, evaluation of
> equivalence may be made by reference to 14.09C.  When there is respiratory or
> cardiac involvement or an associated mental disorder, evaluation may be made
> under 3.00ff, 4.00ff, or 12.00ff, as appropriate.  Other consequences should be
> evaluated according to the listing for the affected body system.

20 C.F.R. § 404, Subpart P, App'x 1, 1.00.  Bornkamp argues that according to paragraph L, the

ALJ should have considered multiple additional listings to properly analyze her scoliosis.  She

further contends that a medical expert may have been necessary given the complexity of the

conditions involved, particularly to determine whether Bornkamp medically equaled one of the

listings mentioned in paragraph L.

But Bornkamp fails to point to any medical findings suggesting that paragraph L applies.

She has not shown impaired ambulation as contemplated by Listing 14.09A, evidence of

respiratory or cardiac involvement, or fixation of the dorsolumbar or cervical spine.  And the

ALJ did consider Bornkamp's mental impairment with respect to Listing 12.00, writing nearly

three pages on the matter.  (AR 29-31).

Furthermore, regarding Bornkamp's suggestion that a medical expert may be necessary, the ALJ relied upon the assessment of the state agency physicians and psychologists, who completed Disability Determination and Transmittal forms at the initial and reconsideration levels and concluded that Bornkamp did not meet or medically equal a listing. (AR 86-89, 102, 116). The Seventh Circuit has articulated that "[t]hese forms conclusively establish that consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review." *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (internal quotation marks and citations omitted). Consequently, "[t]he ALJ may properly rely upon the opinion of these medical experts." *Id*. (citing *Scott v. Sullivan*, 898 F.2d 519, 524 (7th Cir. 1990)); *see also* SSR 96-6p, 1996 WL 374180, at *2-3 (July 2, 1996).

In sum, Bornkamp has failed to carry her burden of showing that her impairments meet or equal a listing. *Maggard*, 167 F.3d at 379-80; *Sims*, 309 F.3d at 428. Because the ALJ's step-three finding that Bornkamp did not meet or equal a listing is sufficiently articulated and is supported by substantial evidence, it will be affirmed.

### E. The ALJ's Credibility Determination Will Not Be Disturbed

Bornkamp also challenges the ALJ's finding that her symptom testimony was not entirely credible, arguing that the ALJ failed to consider the totality of her impairments and considered only a "limited number of factors" in his credibility determination. (DE 14 at 12). For the following reasons, the ALJ's credibility determination will not be disturbed.

An ALJ's credibility determination is entitled to special deference because the ALJ is in the best position to evaluate the credibility of a witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th

Cir. 2000). If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988) (citation omitted), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo*, 458 F.3d at 584 (citation omitted), his determination will be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435; *see Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness"). "[Because] the ALJ is in the best position to observe witnesses, [courts] usually do not upset credibility determinations on appeal so long as they find some support in the record and are not patently wrong." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1995) (citations omitted).

Here, the ALJ considered numerous factors when assessing the credibility of Bornkamp's symptom testimony, some of which Bornkamp does not materially challenge. For example, the ALJ considered that she worked part time at McDonald's after her alleged onset date. (AR 28); *see Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) ("Although the diminished number of hours per week indicated that Berger was not at his best, the fact that he could perform some work cuts against his claim that he was totally disabled."). The ALJ also observed inconsistencies about why Bornkamp quit her job at McDonald's. (AR 21, 28). The ALJ noted that Bornkamp testified that she quit due to physical difficulties (AR 69-73), but the record reveals that she quit primarily because she found out her disability benefits from her previous job would be cut off by her employment at McDonald's (AR 29 (citing AR 900-01)). Bornkamp challenges this reason, asserting that "it is not at all clear what Ms. Bornkamp said or whether it was accurately recorded in the notes." (DE 14 at 14). The Court disagrees; the treatment notes

are quite clear that Bornkamp expressed that she quit her McDonald's job because of its impact on her disability benefits, rather than because it was too physically or mentally challenging for her.  (AR 900-01); *see* SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996) ("The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record.").

Additionally, the ALJ found that Bornkamp's treatment was effective for her mental health symptoms and that many of her mental status exams were unremarkable, even when she was off of her medications.  (AR 23-24, 30-33 (citing AR 786-89, 839-44, 894-908, 1111-18)). Bornkamp disputes the ALJ's reasoning in this respect, emphasizing that "mental illness in general and bipolar disorder in particular . . . may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment."  (DE 14 at 14 (footnote omitted) (citing *Kangail v. Barnhart*, 454 F.3d 627, 630-31 (7th Cir. 2006))).  Contrary to Bornkamp's assertion, the ALJ expressed an awareness of the episodic nature of bipolar disorder.  The ALJ explicitly took into account the diagnosis of bipolar disorder when limiting Bornkamp to simple tasks with limited workplace interactions.  The ALJ explained that the record actually indicated that Bornkamp was capable of facing greater mental challenges, but he wanted to provide her with a less complex and interactive environment so that she could sustain the work on a consistent basis.  (AR 33); *see Johnson v. Astrue*, No. 11 CV 6668, 2012 WL 5989284, at *11 (N.D. Ill. Nov. 29, 2012) ("[A]n ALJ cannot rely solely on the claimant's or doctor's hopeful remarks made during better days, but must consider whether the claimant can hold a job even on low days." (citing *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008))).

The ALJ also considered that Bornkamp's physical symptoms improved after surgery, leading him to conclude that the June 2009 spinal surgery was very successful in addressing her low back complaints and the effects of scoliosis. (AR 26-28, 30). Notably, at her one-year followup in June 2010, Dr. Arata wrote that she had done "remarkably well," that she had only occasional low back pain, and that her symptoms were "not all that severe." (AR 27 (citing AR 1023)). Nor did Bornkamp complain to Dr. Rahn of pain in her thoracic or lumbar spine, demonstrating 5/5 strength in her extremities and a negative straight leg raising bilaterally. (AR 27 (citing AR 890-91)). Additionally, consulting examinations by Drs. Onamusi, Bojrab, and Bacchus yielded fairly benign results. (AR 28 (citing AR 781-83, 890-91, 1059-61)). The opinion that Bornkamp could perform light work is reflected in various opinions of the state agency doctors of record, as well as the opinions of Drs. Onamusi and Bacchus. (AR 28-29 (citing AR 96-97, 110-11, 701-07, 760, 783, 792-98, 882-89, 1061)).

Also, the ALJ considered that Bornkamp performed a fairly broad range of daily activities. (AR 22-23). Specifically, the ALJ observed that Bornkamp cooks several times a week; performs cleaning and household chores, including vacuuming, laundry, and taking out the trash; shops for groceries several times a month; mows a three-and-a-half-acre lawn with a riding mower and works in the yard; drives a car; socializes with family and friends, despite her assertion that she had no friends; and plans a busy holiday season. (AR 22-23, 32 (citing AR 63-64, 66, 375, 391, 842, 895, 1055, 1070-71)). And as stated earlier, she also worked 20 hours a week during a portion of the relevant period. The ALJ specifically noted that Bornkamp's job at McDonald's required constant standing, reaching, and carrying, which is inconsistent with her testimony that she could stand for just 30 minutes and walk for just 30 minutes during an eight-

hour workday.  (AR 26, 28, 74).

But Bornkamp argues that the ALJ failed to recognize that "[t]he critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter [and] can get help from other persons . . . ." (DE 14 at 13 (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)).  She argues that she must do tasks for herself despite the challenges that she faces and that she sought employment out of desperation due to her limited finances.  (DE 14 at 13).

That argument, however, overreaches, as the ALJ did not improperly equate her ability to perform her daily activities with an ability to work full time.  Tellingly, Bornkamp fails to cite to any portion of the ALJ's decision to support this contention.  (*See* DE 14 at 12-13).  Bornkamp ignores the fact that the applicable regulations and precedential case law instruct an ALJ to consider a claimant's performance of daily activities as a factor in his credibility assessment. *See Pepper v. Colvin*, 712 F.3d 351, 368-69 (7th Cir. 2013); *Schmidt*, 395 F.3d at 747; 20 C.F.R. § 404.1529(c)(3); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996).  Furthermore, the ALJ acknowledged that Bornkamp received some assistance from her mother with her daily activities in that they shared cooking and cleaning duties.  (AR 22 (citing AR 63)).  However, the ALJ further considered that Bornkamp had lived alone in her own apartment before moving in with her mother.  (AR 22 (citing AR 51)).  Notably, Bornkamp testified that she moved in with her mother because she could no longer afford her apartment, *not* because of her physical or mental impairments.  (AR 51).  As such, Bornkamp's challenges to the ALJ's consideration of her daily activities is unpersuasive.

In sum, "an ALJ's credibility assessment will stand 'as long as [there is] some support in

the record.'" *Berger*, 516 F.3d at 546 (alteration in original) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)). Here, the ALJ's credibility assessment is amply supported by the evidence of record—in particular, Bornkamp's part-time work after her alleged onset date, inconsistencies in her reasons for quitting her job at McDonald's, that her mental health treatment was effective, her mostly unremarkable mental status exams, that she physically improved after her surgery, her full range of daily activities, and the various medical opinions indicating that she is not disabled. Ultimately, the ALJ built an adequate and logical bridge between the evidence of record, *see Ribaudo*, 458 F.3d at 584, and his conclusion about the credibility of Bornkamp's symptom testimony is not "patently wrong," *Powers*, 207 F.3d at 435. Therefore, the ALJ's credibility determination, which is entitled to special deference, *Powers*, 207 F.3d at 435, will not be disturbed.

### F. The ALJ's Consideration of the Medical Source Opinions Is Supported by Substantial Evidence

In her final argument, Bornkamp argues that the ALJ erred by declining to assign controlling weight to the opinions of Dr. Arata, her treating orthopedic surgeon, and Dr. Wallace, her treating primary care provider. For the following reasons, the ALJ's consideration of the medical source opinions of record is supported by substantial evidence.

The Seventh Circuit has explained that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870 (citations omitted); *see* 20 C.F.R. § 404.1527(c)(2). However, this principle is not absolute, as "[a] treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*,

227 F.3d at 870 (citation omitted); *see Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002);

20 C.F.R. § 404.1527(c)(2).

In the event the treating physician's opinion is not well supported or is inconsistent with

other substantial evidence, the Commissioner applies the following factors to determine the

proper weight to give the opinion: (1) the length of the treatment relationship and frequency of

examination; (2) the nature and extent of the treatment relationship; (3) how much supporting

evidence is provided; (4) the consistency between the opinion and the record as a whole; (5)

whether the treating physician is a specialist; and (6) any other factors brought to the attention of

the Commissioner. 20 C.F.R. § 404.1527(c); *see also Books v. Chater*, 91 F.3d 972, 979 (7th

Cir. 1996). The Commissioner must always give good reasons for the weight ultimately applied

to the treating source's opinion. *Clifford*, 227 F.3d at 870; 20 C.F.R. § 404.1527(c)(2).

Although an ALJ may decide to adopt the opinions in a medical source statement

concerning the ability of a claimant to perform work-related activities, the RFC assessment is an

issue reserved to the ALJ. 20 C.F.R. § 404.1545(e); SSR 96-5p, 1996 WL 374183, at *2 (July 2,

1996) ("[A] medical source statement must not be equated with the administrative finding known

as the RFC assessment."). The RFC is a determination of the tasks a claimant can do despite her

limitations. 20 C.F.R. § 404.1545(a)(1). The RFC assessment:

> is based upon consideration of all relevant evidence in the case record, including
> medical evidence and relevant nonmedical evidence, such as observations of lay
> witnesses of an individual's apparent symptomology, an individual's own
> statement of what he or she is able or unable to do, and many other factors that
> could help the adjudicator determine the most reasonable findings in light of all
> the evidence.

SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see* 20 C.F.R. § 404.1545. Thus, a medical

source opinion concerning a claimant's work ability is not determinative of the RFC assigned by

the ALJ.  *See Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) ("[T]he determination of a claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide." (citing 20 C.F.R. § 404.15279d)); *see* SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996).

To review, in December 2009, Dr. Arata assigned Bornkamp permanent restrictions limiting her to occasional lifting waist to shoulder, lifting overhead, standing, walking, and balancing; and precluding all lifting from the floor to waist and with arms extended, pushing, pulling, stooping, bending, squatting, kneeling, crawling, or climbing.  (AR 1029).  Dr. Arata wrote that it would be "difficult, if not impossible" for her to find employment.  (AR 1022).  Later that same month, Dr. Wallace stated that he agreed with Dr. Arata's restrictions, and he added a 15-pound lifting restriction.  (AR 764).  In July 2013, Dr. Arata acknowledged that Bornkamp was applying for disability and indicated that he would lend her support if requested.  (AR 1024).

The ALJ afforded "[l]ittle weight" to Dr. Arata's restrictions and to Dr. Wallace's adoption of those restrictions.  (AR 29).  The ALJ provided two reasons for doing so: (1) that Dr. Arata assigned these restrictions in 2009 and the records since that time reflect that Bornkamp improved over what Dr. Arata expected; and (2) the work that Bornkamp performed at McDonald's could not have been performed within these restrictions.  (AR 29).  Bornkamp argues that these two reasons are "legally insufficient," asserting that Dr. Arata reaffirmed his opinion in a November 2013 letter and that Bornkamp's employment at McDonald's was of short duration.  (DE 14 at 15).

With respect to Bornkamp's employment at McDonald's, the Court has already concluded that the evidence supports the ALJ's conclusion that she quit the job not due to her

physical or mental impairments, but because she realized it would cut off her disability benefits from her previous job. Therefore, the Court need not revisit that argument here.

As to Dr. Arata's November 2013 letter, Bornkamp submitted this letter to the Appeals Council after the ALJ issued his decision. (AR 5, 466-68, 1122-24). When a claimant provides additional evidence to the Appeals Council, the Council "must determine (i) whether the proffered new evidence relates to the proper time period and (ii) whether the evidence is 'new' and 'material.'" *Binzen v. Barnhart*, No. 01 C 2716, 2002 WL 31324061, at *1 (N.D. Ill. Oct. 16, 2002) (quoting *Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir. 1997)); *see also Getch v. Astrue*, 539 F.3d 473, 483-84 (7th Cir. 2008); 20 C.F.R. § 404.970(b). "If the Appeals Council answers both of these questions in the affirmative it must then determine whether the ALJ's decision is contrary to all of the evidence, i.e., the evidence before the ALJ and the new and material evidence submitted to the Appeals Council." *Binzen*, 2002 WL 31324061, at *1 (citing *Perkin*s, 107 F.3d at 1294). "If the Appeals Council denies review at this stage—essentially reasoning that all of the evidence does not undermine the ALJ's decision—then the Council's decision is unreviewable," *id.* (citing *Perkins*, 107 F.3d at 1294), provided, however, that the refusal does not rest on a mistake of law, such as a determination that the evidence newly submitted to the Appeals Council was not material to the disability determination, *Eads v. Sec'y of Dept. of Health & Human Servs.*, 983 F.2d 815, 817 (7th Cir. 1993).

In its Notice of Appeals Council Action sent to Bornkamp, the Appeals Council expressly acknowledged its review of Dr. Arata's November 2013 letter. (AR 1-5). The Appeals Council explained, however, that the newly-submitted information did not provide a basis for changing the ALJ's decision. (Tr. 1-5). As such, the Council's decision is

unreviewable.

Bornkamp could have sought a remand based on sentence six of 42 U.S.C. § 405(g). The sixth sentence of 42 U.S.C. § 405(g) permits a remand "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." For sixth sentence purposes, "'materiality' means that there is a 'reasonable probability' that the Commissioner would have reached a different conclusion had the evidence been considered, and 'new' means evidence not in existence or available to the claimant at the time of the administrative proceeding." *Perkins*, 107 F.3d at 1296; *see also Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993).

Bornkamp, however, did not request a remand based on sentence six. (*See* AR 14 at 15-16). Nor did Bornkamp argue—much less establish—that Dr. Arata's letter is "new" and "material" evidence sufficient to satisfy sentence six's requirements.

In any event, Dr. Arata's November 2013 letter does not constitute "new" evidence. The letter summarizes the evaluation and treatment information contained in his progress notes that were already included in the record. Likewise, Dr. Arata's opinion that Bornkamp's "back symptoms are genuine and permanent," that she is "unable to physically work because of her severe scoliosis and extensive spinal fusion," and that she should "genuinely qualify for permanent physical disability because of her spinal condition" was derived from medical evidence already in the record, rather than new clinical findings. (AR 1123); *compare Sears v. Bowen*, 840 F.2d 394, 399 (7th Cir. 1988) (finding that a psychological evaluation performed after the ALJ's decision was new evidence as "it was not in existence at the time of the administrative proceedings"), *with Sample*, 999 F.2d at 1144 (emphasizing that a physician's

report derived from medical evidence already in the record did not constitute new information); *see also Perkins*, 107 F.3d at 1296; *Harris v. Barnhart*, No. 03 C 3185, 2005 WL 1655202, at *15 (N.D. Ill. April 26, 2005) ("Evidence is new if it is not merely cumulative." (citing *Sears*, 840 F.2d at 399)).

For that same reason, Dr. Arata's November 2013 letter is not material. The letter essentially repackages information contained in his prior documentation indicating that Bornkamp has pain with prolonged sitting, standing, or walking; that she is genuinely affected by her scoliosis; and that he supports her claim for disability. (AR 1022, 1024, 1123). Dr. Arata does not provide any additional clinical findings in the letter. As a result, there is not a reasonable probability that the ALJ would have reached a different conclusion if Dr. Arata's letter was considered, *see Perkins*, 107 F.3d at 1296, and thus, it is not material.

And even if Dr. Arata's letter was new and material, Bornkamp fails to show good cause as to why it was not produced during the pendency of the proceedings. 42 U.S.C. § 405(g). The letter was issued in November 2013—several months *before* the hearing and *before* the ALJ issued his decision. The burden of meeting all of the requirements for a remand under sentence six of 42 U.S.C. § 405(g) lies with Bornkamp. *See Jens*, 347 F.3d at 214. Here, she has failed to carry that burden. Consequently, Bornkamp's final argument is unavailing, and the Commissioner's final decision will be affirmed.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The

Clerk is directed to enter a judgment in favor of the Commissioner and against Bornkamp.

      SO ORDERED.

      Entered this 23rd day of September 2016.

                            /s/ Susan Collins
                            Susan Collins,
                            United States Magistrate Judge